**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
JOHN DOE 1 & JOHN DOE 2,          )
                                            )
                    Plaintiffs,          )
                                            )
          v.                              )          Civil Action No. 17-2694 (ABJ)
                                            )
FEDERAL ELECTION COMMISSION,  )
                                            )
                    Defendant.          )
_____)

## MEMORANDUM OPINION

Plaintiffs John Doe 1 and John Doe 2, a trustee and the trust, challenge the decision of the Federal Election Commission ("FEC") to disclose their identities when it publicly releases the file pertaining to an investigation that is now closed.  Plaintiffs, whose names and identifying information appear in the file, assert that the agency's decision is unlawful because releasing their identities would violate the Federal Election Campaign Act and its regulations, the Freedom of Information Act, and plaintiff's rights under the First Amendment of the U.S. Constitution.  They have brought this case under the Administrative Procedure Act and ask the Court to enjoin the agency from disclosing their identities as part of its release of the investigative file.

For the reasons explained below, the Court will not enjoin defendant's disclosure of plaintiffs' identities pursuant to the agency's disclosure policy.

## BACKGROUND

The Federal Election Campaign Act ("FECA" or "the Act") is a statute that imposes extensive recordkeeping and disclosure requirements of campaign contributions in an effort "to remedy corruption of the political process."  *FEC v. Akins*, 524 U.S. 11, 11 (1998).  Among its

requirements, the Act prohibits "mak[ing] a contribution in the name of another person or knowingly permit[ting] his name to be used to effect such a contribution" or "knowingly accept[ing] a contribution made by one person in the name of another person." 52 U.S.C. § 30122. The Act established the Federal Election Commission, and it requires the agency to investigate violations of the Act. 52 U.S.C. §§ 30106(a)–(b), 30107(a). It also sets forth requirements for how the agency's investigations are handled, including the public disclosure of the results of investigations and of the materials and information uncovered in them. *See, e.g.*, 52 USC §§ 30109(a)(12)(A); (a)(4)(B)(ii). This case concerns whether the identities of an individual and an entity, who were not named as respondents in an FEC investigation, but were alleged to have had some role in or connection to the activities being investigated, may be disclosed by the agency as part of the release of its investigative materials.

## FACTUAL AND PROCEDURAL HISTORY

On February 27, 2015, the FEC received an administrative complaint from Citizens for Responsibility and Ethics in Washington ("CREW"), alleging that American Conservative Union, Now or Never PAC, the PAC's treasurer James C. Thomas III, and an unknown respondent violated the Federal Election Campaign Act when American Conservative Union made a $1.71 million contribution, which it received from an unknown respondent, to Now or Never PAC. *See* Pls.' Emergency Mot. for TRO and Prelim. Inj. and Mem. of P. & A. in Supp., (Sealed)

[Dkt. # 4],[1] (Redacted) [Dkt. # 13] ("Pls.' Mot.") at 2–3; Decl. of John Doe 1, (Sealed) [Dkt. # 4-1], (Redacted) [Dkt. # 13-1] ¶ 3; Resp. to Pls.' Mot., (Sealed) [Dkt. # 8] (Redacted) [Dkt. # 16] ("Def's. Opp.") at 1; *see also* CREW's Admin. Compl., ¶¶ 1, 13–20, https://www.fec.gov/files/legal/murs/6920/17044434345.pdf.

The agency initiated an investigation based on these allegations, Matter Under Review ("MUR") 6920, and it identified Government Integrity LLC as the "unknown respondent." Def.'s Opp. at 1. The FEC's Office of General Counsel ("OCG") learned through discovery that Government Integrity wired $1.8 million to American Conservative Union on the same day that American Conservative Union sent $1.7 million to Now or Never PAC and that John Doe 2 – which had a relationship with Government Integrity[2] – had transmitted funds to Government

---

1    On December 18, 2017, the court granted plaintiffs' motion to seal this case. Order [Dkt. # 5] (allowing the case to proceed temporarily under seal). After the case was assigned to the undersigned judge, the Court ordered the parties to file public, redacted versions of their previously sealed pleadings on the docket, and by agreement of the parties, the FEC published a redacted version of the investigative file in dispute on its website at https://www.fec.gov/data/legal/matter-under-review/6920/. *See* Min. Order (Dec. 18, 2017); Min. Order (Dec. 19, 2017). This memorandum opinion cites to the public versions of the filings in this case.

2    *See* FEC Memorandum, Circulation of Discovery Documents (Aug. 4, 2017) at 2, https://www.fec.gov/files/legal/murs/6920/17044435462.pdf. ("In response to our request for information regarding the known principals and agents of [Government Integrity] LLC, Thomas states [REDACTED] 'acting as trustee of an entity named [REDACTED]' [REDACTED] appointed GI LLC's now-deceased principal.").

Integrity immediately before that.[3]  *See* Third General Counsel's Report (Sept. 15, 2017) at 6, https://www.fec.gov/files/legal/murs/6920/17044435484.pdf.

On August 10, 2017, the OGC served a subpoena for information on plaintiffs John Doe 1 and John Doe 2.  Def.'s Opp. at 1–2.  Plaintiffs refused to respond to the subpoena, Def.'s Opp. at 1–2, and on September 15, 2017, the OGC recommended that the Commission find reason to believe that plaintiffs violated 52 U.S.C. § 30122 and authorize the filing of a civil action to enforce the subpoena.  Pls.' Reply Mem. in Supp. of Pls.' Mot., (Sealed) [Dkt. # 8]; (Redacted) [Dkt. # 25] ("Pls.' Reply") at 3; Third General Counsel's Report at 12–13.

On September 20, 2017, the Commission rejected the OGC recommendation by a vote of 3 to 2.  Pls.' Reply at 3; Def.'s Opp. at 2; Certification (Sept. 20, 2017), https://www.fec.gov/files/legal/murs/6920/17044434647.pdf.  That same day, the Commission voted 5 to 0 to authorize the OGC to pursue conciliation with American Conservative Union and "pre-probable cause" conciliation with Government Integrity, Now or Never PAC, and Mr. Thomas.  *Id.*  Finally, it voted 5 to 0 to "[t]ake no action at this time on the remaining recommendations" of the OGC.  *Id.*  The FEC did not inform plaintiffs of the OGC's allegations and recommendations.  Pls.' Reply at 3–4.

---

3       "On August 10, 2017, the Commission served [REDACTED] through its trustee, [REDACTED] with a Subpoena and Order requesting the production of documents and the answers to interrogatories regarding its role in the transaction and the source of the funds used to make a contribution to Now or Never PAC.  [REDACTED] response was due on August 25, 2017.  The day before response was due, [REDACTED] newly retained counsel requested an extension of seventeen days.  Because of statute of limitations concerns, OGC was unable to grant the request.  Nonetheless, counsel for [REDACTED] stated that [REDACTED] would not respond to the Subpoena and Order until September 11, 2017."  Third General Counsel's Report at 5.

Thereafter, the agency entered into conciliation discussions with respondents to the investigation and ultimately reached a conciliation agreement with them.  *See* Def.'s Opp. at 2; Pls.' Reply at 4.  On October 24, 2017, the Commission voted unanimously to approve the conciliation agreement, which involved Government Integrity, American Conservative Union, Now or Never PAC, and James C. Thomas III.  Def.'s Opp. at 2; Certification (Oct. 24, 2017), https://www.fec.gov/files/legal/murs/6920/17044434742.pdf.  That agreement concluded MUR 6920.  *Id.*  Government Integrity agreed not to contest the Commission's finding against it any further, and the respondents collectively agreed to pay a civil penalty of $350,000.  Def.'s Opp. at 2.

On November 3, 2017, the FEC notified CREW of the results of its investigation, advising that:

> the Commission found that there was probable cause to believe American Conservative Union violated 52 U.S.C. § 30122 . . . .  The Commission also found reason to believe that Government Integrity, LLC, violated 52 U.S.C. § 30122; that Now or Never PAC and James C. Thomas, III in his official capacity as treasurer knowingly and willfully violated 52 U.S.C. §§ 30122 and 30104(b); and that James C. Thomas, III knowingly and willfully violated 52 U.S.C. §§ 30122 and 30104(b).

Letter from Antoinette Fuoto, FEC, to Anne L. Weismann, CREW (Nov. 3, 2017), https://www.fec.gov/files/legal/murs/6920/17044434744.pdf ("FEC Closing Letter"), at 1.

The FEC also advised that pursuant to its disclosure policy, "[d]ocuments related to the case [would] be placed on the public record within 30 days" – or by December 3, 2017.  FEC Closing Letter at 1, citing Disclosure of Certain Documents in Enforcement and Other Matters, 81 Fed. Reg. 50,702 (Aug. 2, 2016) ("Disclosure Policy").

Counsel for plaintiffs and counsel for Government Integrity objected to the publication of their clients' names and identifying information in connection with the release of the investigative

file.  Pls.' Mot. at 3.  While the agency was considering these objections, and after the 30-day deadline to release the investigation file had passed, CREW contacted the agency to ask when it would publish the file.  Def.'s Opp. at 3.

On December 12, 2017, the FEC told counsel for Government Integrity that, pursuant to its disclosure policy, the agency would not redact plaintiffs' names when it released the investigative file.  Pls.' Mot. at 3.  Two days later, on December 14, the FEC advised plaintiffs' counsel of this decision.  Pls.' Reply at 4; Def.'s Opp. at 3.  Plaintiffs asked the agency to wait two business days to publish the file, and the agency agreed to wait until December 18, 2017 at 5:00 p.m. or later to do so.  Pls.' Mot. at 4; Def.'s Opp. at 3.

On the next day, December 15, 2017, plaintiffs filed this lawsuit.  Compl., (Sealed) [Dkt. # 1]; (Redacted) [Dkt. # 12]; Pls.' Mot.  They filed a sealed complaint and a sealed motion for a temporary restraining order, asking the Court to enjoin the agency from releasing their identities in its investigative file.  On December 18, 2017, defendant filed its opposition to plaintiffs' motion, Def.'s Opp., and on that day, the Court held a sealed hearing in which the FEC agreed to redact plaintiffs' names and any other identifying information from its investigative file and not publish the redacted information until further order of the Court in this case.  Min. Order (Dec. 18. 2017). In light of that agreement, the Court denied plaintiffs' motion for a temporary restraining order as moot and consolidated the motion for a preliminary injunction with the merits of the case.  *Id.*, citing Fed. R. Civ. Proc. 65.

On December 19, 2017, Commissioner Ellen Weintraub released through Twitter a redacted version of a Statement of Reasons concerning this matter and the September 20 vote of 2 to 3 against authorizing action to enforce the subpoena against plaintiffs.  Pls.' Reply, Ex. C; Commissioner Weintraub Statement of Reasons, https://www.fec.gov/files/legal/murs/6920/

17044435456.pdf ("Weintraub Statement of Reasons").   On December 20, 2017, Commission

Vice Chair Caroline Hunter and Commissioner Lee Goodman issued their own Statement of

Reasons about the vote.   Statement of Reasons (Dec. 20, 2017), https://www.fec.gov/files/legal/

murs/6920/17044435563.pdf ("Hunter and Goodman Statement of Reasons").

On December 22, 2017, defendant filed notice with the Court that it had published a

redacted version of the investigative file.   Notice [Dkt. # 20].   On January 3, 2018, plaintiffs filed

their reply in support of their motion.   Pls.' Reply.   Finally, on February 12, 2018, CREW filed an

amicus brief in this matter.[4]   Brief of CREW and Anne Weismann as Amici Curiae [Dkt. # 45].

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") establishes the scope of judicial review of

agency action.   *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435

U.S. 519, 545–49 (1978).   It requires courts to "hold unlawful and set aside agency action, findings,

and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," in excess of statutory authority, or "without observance of procedure

required by law."   5 U.S.C. §§ 706(2)(A), (C) and (D).

Courts are required to analyze an agency's interpretation of a statute by following the two-

step procedure set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837

(1984).   First, the court must determine "whether Congress has directly spoken to the precise

question at issue."   *Id.* at 842.   "If the intent of Congress is clear, that is the end of the matter; for

---

4      CREW filed a motion to intervene in this action on January 3, 2018, Mot. to Intervene by
CREW and Anne Weismann [Dkt. # 22], which the Court denied on January 31, 2018, authorizing
CREW instead to file an amicus curaie brief.   *See* Order [Dkt. # 44].

the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.  If the court concludes that the statute is either silent or ambiguous, the second step of the court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843.

Once a reviewing court reaches the second step, it must accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer." *Id.* at 844.  "[U]nder *Chevron,* courts are bound to uphold an agency interpretation as long as it is reasonable – regardless whether there may be other reasonable or, even more reasonable, views." *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1321 (D.C. Cir. 1998).  And the court must defer to an agency's reading of its own regulations unless it is "plainly erroneous or inconsistent with the regulation." *Id.* at 1320 (internal quotation marks omitted).

## ANALYSIS

The Federal Election Campaign Act has a number of provisions that address the confidentiality of investigation materials.  The Court has concluded that the issue cannot be resolved at the *Chevron* step one stage, since none of the statutory provision cited by the parties speaks directly to the matter.

**I.     Disclosure in this case is neither barred by 52 U.S.C. § 30109(a)(4)(B)(i), as plaintiffs contend, nor required by section 30109(a)(4)(B)(ii), as the FEC contends.**

The Federal Election Commission's administrative enforcement authority is set forth in 52 U.S.C § 30109.  Subsection (a)(4) specifies the informal methods and procedures the agency may invoke to correct or prevent violations of FECA.  *Id*. at § 30109(a)(4).  Subsection (a)(4)(A) requires the FEC to attempt to correct or prevent a violation through a number of informal methods, and it authorizes the agency to enter into conciliation agreements with any person involved.  *Id*. at

§ 30109(a)(4)(A).  "A conciliation agreement, unless violated, is a complete bar to any further action by the Commission."  *Id*.

The Commission seeks to disclose its investigative file for MUR 6920 pursuant to subsection (a)(4)(B), which governs disclosures by the agency within the context of these conciliation attempts and agreements.  Def.'s Opp. at 4.  Subsection (a)(4)(B)(i) states the following with regard to conciliation attempts:

> No action by the Commission or any person, and no information derived, in connection with any conciliation attempt by the Commission under subparagraph (A) may be made public by the Commission without the written consent of the respondent and the Commission.

52 U.S.C. § 30109(a)(4)(B)(i).  Subsection (a)(4)(B)(ii) deals with conciliation agreements:

> If a conciliation agreement is agreed upon by the Commission and the respondent, the Commission shall make public any conciliation agreement signed by both the Commission and the respondent.  If the Commission makes a determination that a person has not violated this Act or chapter 95 or chapter 96 of Title 26, the Commission shall make public such determination.

52 U.S.C. § 30109(a)(4)(B)(ii).

The Court agrees with defendant that subsection (a)(4)(B)(i) does not *bar* the agency from making the disclosures plaintiffs seek to enjoin here, since the prohibition in that subsection is limited to disclosure of any action by the Commission, or information derived "in connection with any *conciliation attempt* by the Commission under subparagraph (A)."   52 U.S.C. § 30109(a)(4)(B)(i) (emphasis added).  In other words, that provision relates to the confidentiality of the conciliation process.

But plaintiffs are correct that subsection (a)(4)(B)(ii) does not *require* the agency to disclose the plaintiffs' identity either, since the record reflects that the Commission did not make any "determination" that plaintiffs had not violated the Act; it simply did not vote to find reason

to believe that they had.  *See* Exhibit A to Def.'s Opp. [Dkt. # 25-1] at 41–44.  Thus, subsection

(a)(4)(B) does not mandate the outcome in this case.

## II.     Disclosure in this case is not barred by subsection (a)(12)(A), as plaintiffs contend.

Subsection (a)(12)(A) governs the disclosure of notifications or investigations:

> Any notification or investigation made under this section shall not be made
> public by the Commission or by any person without the written consent of
> the person receiving such notification or the person with respect to whom
> such investigation is made.

52 U.S.C. § 30109(a)(12)(A).  Plaintiffs point to this subsection to support their argument that

disclosure of their names is prohibited.  Pls.' Mot. at 8–10.  The Commission interprets this

provision as governing disclosures of *pending* investigations only, and it argues that any other

interpretation would be inconsistent with the statutory mandate in subsection (a)(4)(B)(ii) to make

certain disclosures at the conclusion of an investigation.  Def.'s Opp. at 6–8.

The Court acknowledges that the issue before it is not an easy one to resolve, but it is not

writing on a blank slate.  The D.C. Circuit has considered the scope of subsection (a)(12)(A) and

disclosures by the FEC in a case that struck down the agency's prior disclosure policy.  As the

FEC explained in the Federal Register Notice announcing its current policy:

> For approximately the first 25 years of is existence, the Commission viewed
> the confidentiality requirements as ending with the termination of a case.
> The Commission placed on its public record the documents that had been
> considered by the Commissioners in their determination of a case, minus
> those materials exempt from disclosure under the FECA or under the
> Freedom of Information Act . . . .

Disclosure Policy, 81 Fed. Reg. at 50702.  In 2001, however, that policy was challenged in court,

and the district court rejected the agency's longstanding interpretation of the confidentiality

provision in subsection (a)(12)(A).  *See AFL-CIO v. FEC,* 177 F. Supp. 2d 48, 56 (D.D.C. 2001)

(holding based on its plain language that the protections in subsection (a)(12)(A) do not lapse as soon as the FEC terminates an investigation).

On appeal, the D.C. Circuit affirmed the district court's decision with respect to the disclosure of the particular materials at issue in that case, but it did not adopt the lower court's interpretation. Specifically, it rejected the district court's conclusion that the plain text of subsection (a)(12)(A) clearly prohibited disclosure and that the case could be resolved at the first step of the *Chevron* analysis:

> [W]e think the Commission may well be correct that subsection (a)(12)(A) is silent with regard to the confidentiality of investigatory files in closed cases and that Congress merely intended to prevent disclosure of the fact that an investigation is pending. But even if the AFL-CIO could convince us that its alternate construction represents the more natural reading of subsection (a)(12)(A), the fact that the provision can support two plausible interpretations renders it ambiguous for purposes of *Chevron* analysis.

*AFL-CIO v. FEC,* 333 F.3d 168, 174 (D.C. Cir. 2003).[5] This ruling is binding on this Court.

The Court of Appeals then proceeded to consider step two of the *Chevron* analysis: whether the Commission's disclosure policy constituted a permissible construction of the statute. It observed: "[a]t this stage of our *Chevron* analysis, we would normally accord considerable deference to the Commission . . . particularly where, as here, Congress took no action to disapprove the regulation when the agency submitted it for review pursuant to 2 U.S.C. § 438(d)." *Id.* at 175 (citations omitted). At the same time, however, the Court recognized that "we do not accord the

---

5     The Court notes that the concurring opinion in *AFL-CIO* did agree with the interpretation that plaintiffs advance here, finding it to be compelled by the plain text of subsection (a)(12)(A). *See* 333 F. 3d at 180–84 (J. Henderson, concurring) ("While the provision does not state in so many words that 'no *completed* investigation shall be made public,' that does not mean it is silent on the matter; whatever the word "investigation" means, section 437g(a)(12)(A) plainly covers '*[a]ny* . . . investigation,' ongoing or completed.") (emphasis in original).

Commission deference when its regulations 'create serious constitutional difficulties.'" *Id.*, citing *Chamber of Commerce v. FEC,* 69 F. 3d 600, 604–05 (D.C. Cir. 1995).  Faced with a policy that called for the placement of the agency's *entire* investigatory file in the *AFL-CIO* matter on the public record, the Court concluded that "the Commission failed to tailor its disclosure polity to avoid unnecessarily infringing upon First Amendment rights."  *Id.*

The Court rejected arguments that the longstanding disclosure policy warranted *Chevron* deference and was essential to public oversight of the Commission.  *Id*. at 172.

> In sum, although we agree that deterring future violations and promoting Commission accountability may well justify releasing more information than the minimum disclosures required by section 437g(a), the Commission must attempt to avoid unnecessarily infringing on First Amendment interests where it regularly subpoenas materials of a delicate nature representing the very heart of the organism which the first amendment was intended to nurture and protect. Because 11 C.F.R. § 5.4(a)(4) fails to undertake this tailoring, it creates the serious constitutional difficulties outlined above.  We therefore conclude that the regulation is impermissible.

*Id.* at 179 (citations, edits, and quotation marks omitted).

In light of that ruling, the Commission revised its disclosure policy, and in 2016, it published the current policy.  Disclosure Policy, 81 Fed. Reg. 50,702.  The FEC undertook to revise the policy as instructed by the Court of Appeals to "avoid unnecessarily infringing on First Amendment interests where it regularly subpoenas materials of a delicate nature."  *Id.* at 50,703.  The policy narrowed the scope of the information that would be made public in closed investigations to "several categories of documents integral to its decisionmaking process . . . as well as documents integral to its administrative functions," including:  administrative complaints, responses to complaints, certain General Counsel's Reports, statements of reasons issued by one or more Commissioners, conciliation agreements, certain memoranda and reports from the OGC

prepared for the Commission in connection with specific pending MURs, and closeout letters.  *Id.*

The agency explained:

> The categories of documents that the Commission intends to disclose as a matter of regular practice either do not implicate the Court's concerns or, because they play a critical role in the resolution of a matter, the balance tilts decidedly in favor of public disclosure, even if the documents reveal some confidential information.

*Id.*

The Commission maintains in this case that the disclosure of plaintiffs' identities as part of the release of the investigative file for MUR 6920 is appropriate under the revised disclosure policy because plaintiffs "are referenced in documents addressing whether there is reason to believe they committed violations of FECA, whether discovery should be sought from them and other parties, and whether there is probable cause to believe others committed violations of FECA."  Def.'s Opp. at 5.  Defendant notes that the administrative complainant CREW did not originally name plaintiffs as respondents because it did not know the source of the contribution at issue, and it acknowledges that the Commission did not designate plaintiffs as respondents after it became aware of their identities in the investigation.  *Id.*  Nevertheless, according to the FEC, plaintiffs "feature[d] prominently" in the investigation, and the Commission asserts that there is "obvious public importance of making the identities of plaintiffs transparent where they appear in the Commission's deliberations."  *Id.*

But the application of the policy to plaintiffs has been challenged on First Amendment grounds, so in accordance with the approach outlined in *AFL-CIO,* the Court must first resolve whether the Commission's revised disclosure policy, and its application to the information plaintiffs are seeking to shield here, are constitutional before it can conduct the *Chevron* step two analysis under the APA and afford the agency the deference it is seeking in this case.

III.     **The Disclosure in this Case Does Not Violate the First Amendment**

   A.     **Disclosure of plaintiffs' identities is not barred by *AFL-CIO*.**

Plaintiffs rely heavily on *AFL-CIO*, but the case is inapposite.  The investigatory files at

issue in *AFL-CIO* involved an estimated 10,000 to 20,000 pages of materials gathered during the

course of the FEC's proceedings, none of which it had reviewed before it dismissed the

administrative complaints under investigation.  333 F.3d at 171–72.  The agency's disclosure

policy at the time required "the release of *all* information not expressly exempted by FOIA."  *Id*.

at 178 (emphasis in original).  Pursuant to that policy, upon closing the investigation, the

Commission made an initial disclosure of 6,000 pages of investigatory material.  *Id*. at 172.  The

AFL-CIO and Democratic National Committee sued to enjoin disclosure, providing affidavits

attesting that the agency's initial and further releases would disclose the names of hundreds of

their volunteers, members, and employees, making make it more difficult for the organizations to

recruit personnel in the future.  *Id*. at 176.  They further attested that the disclosures would make

public "detailed descriptions of training programs, member mobilization campaigns, polling data,

and state-by-state strategies," and that revealing their activities, strategies, and tactics to their

opponents would frustrate their ability to pursue their political goals effectively.  *Id*. at 176–77.

Faced with these concerns, the D.C. Circuit concluded that applying the broad disclosure

policy the agency followed at the time to the DNC and AFL-CIO would raise substantial First

Amendment concerns; the public disclosure of the associations' confidential internal materials

would "intrude[  ] on the 'privacy of association and belief guaranteed by the First

Amendment," and seriously interfere with internal group operations and effectiveness.  333 F.3d

177–78, quoting *Buckley v. Valeo,* 424 U.S. 1, 64 (1976); *see also id.* at 178 (expressing concern

that compelled disclosure of such materials combined with the Commission's broad subpoena

practices would encourage political opponents to file charges against their competitors to chill the expressive efforts of their competitors and to learn and exploit their political strategies).

The Court stated that when analyzing a constitutional challenge to a disclosure requirement, courts must

> balance the burdens imposed on individuals and associations against the significance of the government interest in disclosure and consider the degree to which the government has tailored the disclosure requirement to serve its interests. Where a political group demonstrates that the risk of retaliation and harassment is "likely to affect adversely the ability of . . . [the group] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate," for instance, the government may justify the disclosure requirement only by demonstrating that it directly serves a compelling state interest. In contrast, where the burden on associational rights is "insubstantial," we have upheld a disclosure requirement that provided "the only sure means of achieving" a government interest that was, though valid, "not . . . of the highest importance."

333 F.3d at 176, quoting *Buckley,* 424 U.S. at 64–68, *Block v. Meese,* 793 F.2d 1303, 1315–16 (D.C. Cir. 1986), and *NAAPC v. Alabama*, 357 U.S. 449, 462–63 (1958) (citations omitted) (edits in original).

Here, plaintiffs do not make any claim that anyone's associational rights are being infringed, and disclosing the identities of plaintiffs here would not involve the disclosure of anyone's internal operations or political strategies.

Moreover, the investigative file in *AFL-CIO* involved tens of thousands of pages that the Commission gathered but never reviewed – and so the information in those pages played no role in the agency's decision making process. *See AFL-CIO*, 333 F.3d at 171–72. The unreviewed files included the names of hundreds of volunteers, members, and employees, *id*. at 176, none of whom had any role in the matter being investigated. *See id*. at 171 (describing the underlying complaint to allege that the AFL-CIO and other unions had unlawfully coordinated campaign

expenditures with political candidates and party committees).  By contrast, here the Commission seeks to disclose documents that were central to its handling and decision making in reaching the conciliation agreement and closing MUR 6920, including its decision of whether to pursue litigation against plaintiffs that arose out of and was directly related to the investigation.

The disclosure defendant seeks to make here is pursuant to its recently revised policy, which the agency carefully tailored to minimize the burdens on constitutional rights while providing for sufficient disclosure to advancing legitimate concerns of deterring future violations and promoting Commission accountability.  Thus, the limited disclosure of plaintiff's names would not threaten any of the interests that concerned the Court in *AFL-CIO,* and that case does not govern the outcome here.

### B. Disclosure of plaintiffs' identity does not violate the First Amendment.

So then the question is:  do the reasons advanced for disclosing the records of completed investigations, which the D.C. Circuit stated "may well justify releasing more information than the minimum disclosures required by section 437g(a)," *AFL-CIO*, 333 F.3d at 179, outweigh any concerns the Court might have about the more limited intrusion on First Amendment rights that is being alleged here?

The Court notes at the outset that although John Doe 2 appears to be asserting a First Amendment right to make a political contribution without being identified, *see* Pls.' Reply at 15–17, it is unclear whether John Doe 1 is asserting a personal constitutional right in this case and whether he has standing to raise the First Amendment issue.  The complaint only mentions the constitution once:  paragraph 40 alleges summarily that "[t]he Commission's disclosure of Plaintiffs' names is an arbitrary and capricious decision, and an abuse of discretion because such action violates the First Amendment to the United States constitution."  Compl. ¶ 40; *see also*

16

Compl. ¶ 3 (alleging that the release of their identities is contrary to law under FECA and FOIA for a number of reasons, including that it "has the effect of chilling speech").

But there are no factual allegations in the complaint concerning plaintiffs' exercise of their right to free speech.  In his declaration in support of the motion for injunctive relief, John Doe 1, the trustee, states:

> 10.     The disclosure that John Doe 2 and 1 were even marginally involved in an investigation into alleged violations of campaign finance law will damage my professional reputation [REDACTED].

> 11.     I fear that being connected to this investigation will damage my reputation and John Doe 2's reputation.

Decl. of John Doe 1 in Supp. of Pls.' Mot. (Redacted) [Dkt. # 13-1] ¶¶ 10–11.  These concerns go to John Doe 1's FOIA and privacy concerns, not the constitutional concerns.

John Doe 1 adds:

> 12.     The events subject to the FEC's investigation in MUR 6920 pertained to core First Amendment activity, that is, political fundraising.  It is objectively reasonable to conclude that disclosure of the identities of parties involved in an FEC investigation of events subject to First Amendment protections that result in no FEC enforcement action will be chilled in the exercise of their First Amendment rights.

*Id.* ¶ 12.  This convoluted sentence does not actually specify who it is the trustee posits "will be chilled."  And, since it was the trust, John Doe 2, that allegedly transferred the funds to Government Integrity to be used for the constitutionally protected purpose of funding campaign activities, and John Doe 1 was acting solely on behalf of the trust, it is not clear how John Doe 1's First Amendment rights play any role in this case.[6]

---

6       Indeed, John Doe 1 emphasizes that "the full record now reveals that the FEC accused John Doe 1 of a violation in his official capacity as a trustee only."  Pls.' Reply at 21.

In any event, even if one concludes that at least one plaintiff has asserted an interest in preventing the chilling of future speech in the form of donations, the only right that is implicated by the agency's actions in this case is the right to contribute anonymously, not the right to contribute at all.

Thus, the case is entirely distinguishable from *AFL-CIO,* and, more importantly, notwithstanding the plaintiffs' highly selective quotations from the case law, the constitutional issue has already been decided in the agency's favor.

> The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.

*Citizens United v. FEC*, 558 U.S. 310, 371 (2010).

It is true that in *Buckley v. Valeo*, the Supreme Court stated that disclosure of campaign contributions could chill political activity and impose "not insignificant burdens" on First Amendment rights.  424 U.S. at 65–66, 68.  But as the Court recounted in *Citizens United,* it has repeatedly held that those burdens withstand strict scrutiny.  558 U.S. at 366–71.  In *Citizens United,* the Court addressed not only the provisions of the Bipartisan Campaign Reform Act ("BCRA") that prohibited campaign expenditures by corporations and unions, but also the disclosure provisions contained in the legislation.  And in doing so, it reviewed its treatment of the disclosure issue to date.

> Disclaimer and disclosure requirements may burden the ability to speak, but they "impose no ceiling on campaign-related activities."  The Court has subjected these requirements to "exacting scrutiny," which requires a "substantial relation" between the disclosure requirement and a "sufficiently important" governmental interest.

> In *Buckley*, the Court explained that disclosure could be justified based on a governmental interest in "provid[ing] the electorate with information" about the sources of election-related spending. The *McConnell* Court applied this interest in rejecting facial challenges to BCRA §§ 201 and 311. There was evidence in the record that independent groups were running election-related advertisements "'while hiding behind dubious and misleading names." The Court therefore upheld BCRA §§ 201 and 311 on the ground that they would help citizens "make informed choices in the political marketplace."

558 U.S. at 366–67, quoting *Buckley*, 424 U.S. at 64, 66, and *McConnell v. FEC*, 540 U.S. 93, 196, 201, 231–32 (2003) (internal citations, quotation marks, and brackets omitted); *see also AFL-CIO*, 333 F.3d at 176 (observing that the Court in *Buckley* concluded that the disclosure requirements "survived strict scrutiny as the least intrusive means of achieving several compelling governmental interests"). Therefore, neither the FEC policy on its face nor its application in this case impinges impermissibly on the plaintiffs' First Amendment right to express themselves through political donations.

In *Citizens United*, though, the Court reassured litigants that "as-applied challenges would be available if a group could show a 'reasonable probability' that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either government officials or private parties." *Citizens United*, 558 U.S. at 367, quoting *McConnell*, 540 U.S. at 198 and *Buckley*, 424 U.S. at 74. But plaintiffs do not even allege, much less demonstrate, that there are any grounds to fear that they would be subject to harassment or reprisals – the only harm they allege is the claimed harm to their reputations arising from the fact that they were under investigation.

So the disclosure involved in this case would not offend the Constitution, and the only question that remains to be resolved is whether, considering the privacy issues asserted by the plaintiffs, disclosure is reasonable under standard APA principles.

**IV.    Application of the FEC's Disclosure Policy to Plaintiffs in this case is Reasonable and Consistent with FOIA.**

FECA requires the disclosure of any "conciliation agreement" and any "determination that a person has not violated this Act."  52 U.S.C. § 30109(a)(4)(B)(ii).  The implementing regulation provides:

> If the Commission makes a finding of no reason to believe or no probable cause to believe or *otherwise terminates its proceedings*, it shall make public such action and the basis therefor . . . [and]

> If a conciliation agreement is finalized, the Commission shall make public such conciliation agreement forthwith.

11 C.F.R. §111.20(a)–(b) (emphasis added).   Because, as explained above, there are no constitutional issues implicated by the Commission's proposed disclosure in this case, *Chevron* deference applies.

The Court holds that the agency's interpretation of the statute to require the public disclosure set forth in the regulation is reasonable.   *See AFL-CIO*, 333 F.3d at 178 (recognizing that deterring FECA violations and promoting its own public accountability are valid goals of the disclosure regulation and finding the prior regulation invalid only on the basis that it was not tailored "to avoid unnecessarily burdening the First Amendment rights of the political organizations" the agency investigates).   And the disclosure of plaintiffs' names in this case is consistent with subsection (a)(4)(B)(ii), as it has been interpreted by the agency in 11 C.F.R.§111.20(a).

The Court agrees with plaintiffs that the Commission did not "*make a finding* of no reason to believe" in this case.   Rather, all the Commission did with respect to plaintiffs was decline to make a finding that there *was* reason to believe, even though the OGC asked it to.   But the facts of this case fall well within the provision of the regulation requiring disclosure in cases where the

20

Commission "otherwise terminates its proceedings."  11 C.F.R. § 111.20(a).  The investigation as a whole was otherwise terminated, including the aspect of the matter that involved issuing a subpoena to the plaintiffs.  Indeed, since under terms of the statute, even the names of those who are investigated and *exonerated* are publicly revealed, 52 U.S.C. § 30109(a)(4)(A)(ii), the Court finds that it would not be unreasonable to release the plaintiffs names here.

Plaintiffs emphasize that they were neither targets of, nor respondents to, the MUR 6920 investigation, so they reject the notion that there were any "proceedings" opened or closed as to them.  *See* Pl.'s Reply at 1, 8.  But the language of the regulation is not so narrow, and the public has an interest in the agency's decision to terminate this proceeding involving Government Integrity without enforcing its own subpoenas and following the money back to its source.  And the only reason the Doe 2 trust was not a respondent from the outset was because CREW did not know who the donor was.  This is not a situation where a person's name happened to come up in a wide ranging inquiry.  Plaintiffs here were integrally involved in a narrow, focused investigation: plaintiff John Doe 2 was a link in the single chain involving a single contribution, it is related to Government Integrity, a party to the conciliation agreement, and it was the recipient of a subpoena

from the agency.  The only reason plaintiffs' identity was not revealed in the investigation was because plaintiffs resisted responding to the agency's subpoena.[7]

Plaintiffs also rely on FOIA principles when identifying the privacy interests the agency was bound to protect.  They point out that FOIA Exemption 7(C) exempts from disclosure information compiled for law enforcement purposes, which "could reasonably be expected to constitute an unwarranted invasion of personal privacy;" and that the purpose of the provision is to protect the privacy interests of suspects, witnesses, and investigators.  Pls.' Mot. at 6–8, citing 5 U.S.C. § 552(b)(7)(C), *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991), and *Bast v. DOJ*, 665 F.2d 1251, 1254 (D.C. Cir. 1981).  But John Doe 2 is a trust, *see* Pls.' Mot. at 1,

---

[7]     Plaintiffs make much of the fact that after the Chairman of the Commission published a statement of reasons decrying the resolution of the proceedings before the Commission established who was behind the $1.7 million contribution, *see* Weintraub Statement of Reasons, two of the Commissioners who voted to end the investigation issued a statement of their own.  *See* Pls.' Reply at 4–5, 20, citing Hunter and Goodman Statement of Reasons.  It is true that in a footnote to their separate statement, Vice Chair Hunter and Commissioner Goodman expressed concerns that the Chair had "publicly prejudged" plaintiffs' guilt and "pre-supposed facts and intent without investigation."  Hunter and Goodman Statement of Reasons at 3 n.8.  But plaintiffs make too much of these comments, and their efforts to highlight the footnote obscure the fact that there is nothing in the body of the two Commissioners' Statement of Reasons that militates against disclosure under the FEC policy.  The Hunter and Goodman five-page letter makes several points:  1) that the legal theory underlying the OGC's "reason to believe" recommendation concerning plaintiffs was unclear, and that more factual investigation on the question of intent was needed because "the Commission had circumstantial evidence but not direct evidence," and "time was running out;" 2) the statute of limitations concerning the original respondents was close to expiring, and expanding the matter to include plaintiffs could delay the case further, so "we believed the most efficient prosecutorial path forward was to finalize the case against the 3 Respondents" as efficiently and expeditiously as possible;" 3) the agency's decision to conciliate with the named respondents and avoid "the procedural, legal, and investigative complexities" of adding plaintiffs was well within the agency's prosecutorial discretion; and 4) the decision was in the public interest since the conciliation agreement established precedent and secured a large penalty.  *See* Hunter and Goodman Statement of Reasons.  None of this suggests that the allegations of plaintiffs' involvement or the fact that the agency declined to enforce its own subpoena were not integral to the proceeding or its termination.

and under well-established FOIA principles, an entity has no right to "personal privacy" under

FOIA Exemption 7(C).  *See FCC v. AT&T Inc.*, 562 U.S. 397, 409–10 (2011) (rejecting argument

that "personal privacy" in Exemption 7(C) reaches corporations:  "protection in FOIA against

disclosure of law enforcement information on the ground that it would constitute an unwarranted

invasion of personal privacy does not extend to corporations").  And the actions of John Doe 1, as

the trustee for John Doe 2, were solely on behalf of the trust, not himself, so his asserted privacy

interests are minimal.

Accordingly, the Court defers to the FEC's reasonable interpretation of the statutory

disclosure requirements and holds that the application of that policy to plaintiffs in this case is

valid.  The agency's salutary interest in exposing its decision making to public scrutiny outweighs

plaintiffs' insubstantial privacy concerns.

## CONCLUSION

For the reasons set forth above, the Court will not enjoin defendant's disclosure of

plaintiffs' identities as part of the regular release of the investigative file for MUR 6920 under the

FEC's revised disclosure policy.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 23, 2018